UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____

STEPHEN ARRINGTON,                              :
                                                :
                                                :
                                                :
                                                :
                                                :
                         Plaintiff,             :
                                                :
                                                :        Civil Action No.: 14-3023
           -Against-                            :        (ARR)(VMS)
                                                :
The City of New York, and New York City Police Officer :
Joseph Garofalo, individually and in his official capacity, :        .
                                                :
                                                :
                         Defendants.            :
_____


# FIRST AMENDED COMPLAINT

CARTER & ASSOCIATE ATTORNEYS, PLLC
ATTORNEY FOR PLAINTIFF
224 West 35th Street, Suite 512
New York, New York 10001
(646) 405-5225 Telephone
(888) 711-4420 Facsimile


Damond J. Carter,
    *Of Counsel for the Plaintiff*

Lillane Mair,
    *Of Counsel for the Plaintiff*


Dated: September 25, 2014

# Table of Contents

PRELIMINARY STATEMENT ............................................................1

SUMMARY OF CLAIMS...................................................................2

**A.**   MR. ARRINGTON'S CLAIMS AGAINST THE DEFENDANTS ..............2

**B.**   FACTUAL BACKGROUND.....................................................5

    **1.**   The Parties and Other Relevant Persons and Entities ....................................5

    **2.**   Mr. Arrington's Arrest on October 20, 2013 ..............................................6

    **3.**   Officer Garofalo, Operating Pursuant to Municipal Policy ..........................16

**C.**   CAUSES OF ACTION & RELEVANT FACTUAL ALLEGATIONS .......20

    **A.   FIRST CAUSE OF ACTION: The Defendant Garofalo Maliciously Prosecuted Mr. Arrington where Garofalo Commenced, Instigated and Continued Criminal Proceedings against Mr. Arrington in Absence of Probable Cause, with Actual Malice** ..............................................................................20

    **B.   SECOND CAUSE OF ACTION: Defendant Garofalo Falsely Arrested the Plaintiff Stephen Arrington** ............................................................24

    **C.   THIRD CAUSE OF ACTION: Defendant Garofalo's Malicious Abuse of Criminal Process** .........................................................................25

    **D.   FOURTH CUASE OF ACTION: Defendant Garofalo's Suppressing Exculpatory Evidence regarding Mr. Arrington's Alleged Criminality, as Discussed Herein, Violated Mr. Arrington's Fifth and Fourteenth Amendments U.S. Constitutional Rights not to be Deprived of His Liberty as a Result of said Fabrication of Evidence by the Defendant** .........................................26

    **E.   FIFTH CAUSE OF ACTION: Defendant Garofalo's Conduct of Fabricating Claims of Mr. Arrington's Alleged Criminality as Discussed Herein Constitutes Negligent Infliction of Emotional Distress, Reckless Infliction of Emotional Distress or Intentional Infliction of Emotional Distress** ...........................27

**F. SIXTH CAUSE OF ACTION: The NYPD's Policing Practices, Policies, Procedures, Protocol and Customs Pursuant to which the Defendant Garofalo was Operating, in Arresting and Charging Mr. Arrington, Renders the City of New York Liable for the Defendant Garofalo's Malicious Prosecution of Mr. Arrington** ...................................................................................................28

**G. SEVENTH CAUSE OF ACTION: The NYPD's Policing Practices, Policies, Procedures, Protocol and Customs Pursuant to which the Defendant Garofalo was Operating, in Arresting and Charging Mr. Arrington, Renders the City of New York Liable for the Defendant Garofalo's Malicious Abuse of Criminal Process of Mr. Arrington** .........................................................................................29

**H. EIGHTH CAUSE OF ACTION: The City of New York's Decision To Permanent Deprive Mr. Arrington Of His Weapon And Terminate Mr. Arrington's Concealed Weapon Carry Permit Based On The Underlying Criminal Charges, Where Such Had Been Dismissed, Violated Mr. Arrington's Second Amendment Right To Keep And Bear Arms In His Defense** ..................31

**D.** Jurisdiction and Venue .................................................................................32

**E.** Request for Relief .........................................................................................32

**F.** Jury Demand ................................................................................................32

## PRELIMINARY STATEMENT

PLAINTIFF, STEPHEN ARRINGTON, by and through counsel, alleges the following upon information and belief, except as to those allegations concerning Mr. Arrington, which are alleged upon personal knowledge.  Mr. Arrington's information and belief are based upon among other things, his investigation, the investigations of counsel, as well as Mr. Arrington's personal experience of the claims in question against the Defendants.  Plaintiff believes that further substantial evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## SUMMARY OF CLAIMS

### A.  Mr. Arrington's Claims Against The Defendants

1.      The Plaintiff brings an action pursuant to 42 U.S.C. § 1983 for malicious prosecution against the Defendant Joseph Garofalo, individually and in his official capacity, where Garofalo, acting without probable cause, and acting in his official capacity as a New York City Police Officer, commenced, instigated and/or continued the underlying criminal action at issue, where Garofalo made false claims and attempted to suppress exculpatory evidence against Mr. Arrington, for purposes of obtaining the collateral objective of punishing Mr. Arrington of lawfully exercising his Second Amendment right to use his firearm in his defense, where Garofalo's incredible criminal claims formed the sole basis of the State of New York's underlying criminal charges against Mr. Arrington.

2.      The Plaintiff brings an action pursuant to 42 U.S.C. § 1983 for malicious prosecution against the Defendant City of New York where Garofalo's state action of determining whether there was probable cause to arrest, arresting and charging of Mr. Arrington was pursuant to official municipal policy in the form of the New York City Police Department's policing practices, policies, procedures, protocol, and customs that were department-wide, such that they had the force of law, where inadequate supervision of arrests, including Garofalo's arrest of Mr. Arrington, resulted in Garofalo's arrest and prosecuting of Mr. Arrington in absence of probable cause for purposes of obtaining the collateral objective of punishing Mr. Arrington for exercising his Second Amendment right to use his firearm in his defense, where Garofalo's incredible criminal claims formed the sole basis of the State of New York's underlying criminal charges against Mr. Arrington.

3.      The Plaintiff brings an action pursuant to 42 U.S.C. § 1983 for malicious abuse of criminal process against Garofalo, individually and in his official capacity, where Garofalo, acting within his official capacity as a New York City Police Officer, commenced, instigated and/or continued the underlying criminal action at issue, in which case regular criminal process issued, with Garofalo intending to do harm to Mr. Arrington without excuse or justification, using the aforementioned regular process in a perverted manner to obtain the collateral objective of punishing Mr. Arrington for exercising his Second Amendment right to use his firearm in his defense, where Garofalo's incredible criminal claims formed the sole basis of the State of New York's underlying criminal charges against Mr. Arrington.

4.      The Plaintiff brings an action pursuant to 42 U.S.C. § 1983 for malicious abuse of criminal process against the Defendant City of New York where Garofalo's state action of determining whether there was probable cause to arrest, arresting and charging of Mr. Arrington was pursuant to official municipal policy in the form of the New York City Police Department's policing practices, policies, procedures, protocol, and customs that were department-wide, such that they had the force of law, where inadequate supervision of arrests, including Garofalo's arrest of Mr. Arrington, resulted in Garofalo's arrest and prosecuting of Mr. Arrington in absence of probable cause for purposes of obtaining the collateral objective of punishing Mr. Arrington for exercising his Second Amendment right to use his firearm in his own defense, where Garofalo's incredible criminal claims formed the sole basis of the State of New York's underlying criminal charges against Mr. Arrington.

5.      The Plaintiff brings an action pursuant to 42 U.S.C. § 1983 for false arrest/false imprisonment against Garofalo, individually and in his official capacity, where Garofalo, acting within his capacity as a New York City Police Officer, and acting without justification, actively

3

assisted in the arrest of Mr. Arrington solely on the basis of Garofalo's aforementioned incredible criminal claims.

6.      The Plaintiff brings an action pursuant to 42 U.S.C. § 1983 for false arrest/ false imprisonment against the Defendant City of New York where Garofalo's state action of determining whether there was probable cause to arrest, arresting and charging of Mr. Arrington was pursuant to official municipal policy in the form of the New York City Police Department's policing practices, policies, procedures, protocol, and customs that were department-wide, such that they had the force of law, where inadequate supervision of arrests including, Garofalo's arrest of Mr. Arrington resulted in Garofalo's arrest of Mr. Arrington was without justification and based upon Garofalo's aforementioned incredible criminal claims.

7.      The Plaintiff brings an action pursuant to 42 U.S.C. § 1983 against Garofalo, individually and in his official capacity, for violation of Mr. Arrington's Fifth Amendment and Fourteenth Amendment rights under the United States Constitution not to be deprived of his liberty as a result of fabricated investigatory evidence, where Garofalo knowingly fabricated false evidence and statements and attempted to suppress exculpatory evidence for purposes of presentation of such to the Queens County District Attorney's Office for criminal prosecution of Garofalo's underlying incredible criminal claims, knowing that criminal prosecution could result in the deprivation of Mr. Arrington's liberty, where Garofalo purposefully and knowingly submitted said false evidence and attempted to suppress exculpatory evidence for the improper purpose of punishing Mr. Arrington for having exercised his Second Amendment right to bear arms in his defense, where said incredible criminal claims formed the sole basis of the State of New York's underlying criminal charges against Mr. Arrington, where he was deprived of his liberty, commencing with his October 20, 2013 arrest and imprisonment.

4

8.     The Plaintiff brings an action pursuant to 42 U.S.C. § 1983 for violation of the Plaintiff's Second Amendment right to keep and bear-arms in his self-defense where the New York City Police Department refuses to return Mr. Arrington's firearm after the criminal charges had been dismissed, and have terminated his privileges to carry any firearms, where said action was premised solely and squarely upon the underlying criminal charges, and done so after said charges had been dismissed, where said action was pursuant to official municipal policy, such that it had the force of law.

9.     The Plaintiff's civil rights claims inherently encompass claims for emotional distress.

### B. FACTUAL BACKGROUND

**1.     The Parties And Other Relevant Persons and Entities**

10.     Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "9" above.

11.     Mr. Arrington is a retired Correction Officer for the New York City Department of Correction.

12.     Mr. Arrington, at the time in question, and until the New York City Police Department's March 19, 2014 termination of his privileges, was licensed by the City and State of New York to carry a concealed firearm. With that license, Mr. Arrington possessed and carried a Smith & Wesson Model 64 military and police six shot revolver ("the revolver").

13.     The Defendant Joseph Garofalo is Police Officer for the New York City Police Department ("NYPD").

14.     The NYPD is the municipal agency empowered with the responsibility for policing the City of New York.

5

15.     The 113th Precinct of the NYPD is the location where Mr. Arrington's arrest was processed on October 20, 2013.

**2.      Mr. Arrington's Arrest On October 20, 2013**

16.     Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "15" above.

17.     On October 20, 2013, Mr. Arrington and his fiancée Julita Porcher were on their way to a local Pep Boys when they received a call from their eldest daughter Arjalae Arrington.

18.     At the time Mr. Arrington and Ms. Porcher received Arjalae's phone call, she was traveling with her younger sister Ashlei Arrington, and Arjalae's friend, Deo.

19.     Arjalae asked that Mr. Arrington and Ms. Porcher pick Arjalae, Ashlei and Deo up before going to Pep Boys so as to drop Deo at his home.

20.     As a result, before departing to Pep Boys, Mr. Arrington and Ms. Porcher departed, with Mr. Arrington as the passenger, to pick up their daughters and Deo.

21.     Having picked up the three kids, Mr. Arrington and Ms. Porcher, their two daughters and Deo were traveling in route to Deo's home, when they eye-witnessed a young adult male or teenage male (hereinafter referred to as "Aggressor No. 1") violently assaulting a young adult or teenage woman (hereinafter referred to as "the Young Lady") in the proximity of 174th Street and 110th Avenue in the County of Queens, State of New York.

22.     While traveling south on Brinkerhoff Avenue, about a block away from Deo's home, Ms. Porcher abruptly stopped the car and stated, "Oh my God, look how that guy is beating that girl."  At that point, the family observed Aggressor No. 1's violent assault on the Young Lady.

23.     As Deo exited the vehicle to go into his home, the family and Deo heard the Young Lady's cries from being violently assaulted.

24.     Additionally, the family and Deo witnessed the Young Lady, traveling with two other ladies and four (4) children ranging in approximate ages of four (4) to six (6) years of age, trying to keep pace with the Young Lady as she attempted to flee Aggressor No. 1's violent assault.

25.     However, Aggressor No. 1 was in hot pursuit of the Young Lady as she tried to get away from Aggressor No. 1's violent assault.

26.     Asked if he knew Aggressor No. 1 and the group of young aggressive males he was with, Deo stated that while he didn't know them personally, he did have occasions to witness them in the neighborhood causing problems.

27.     As the family waited for Deo to enter his home, everyone could hear the pleas and cries from the Young Lady, the children and the two other young ladies that accompanied her, as to Aggressor No. 1's violent assault on the Young Lady.

28.     Aggressor No. 1's assault on the Young Lady was so ferocious, that Aggressor No. 1's closed fist punches about the Young Lady's face and body could be heard from a distance.

29.     Having dropped off the friend (i.e. Deo), the family expressed concern to Mr. Arrington about the fact that the Young Lady was being so aggressively assaulted by Aggressor No. 1.

30.     As a result, Mr. Arrington got out of the vehicle in which the family had been traveling to take a closer look at the violent assault.

31.     Nonetheless, before getting closer, Mr. Arrington thought to himself that even from a distance, given the sheer sound of how hard Aggressor No. 1 was hitting the Young Lady with Aggressor No. 1's closed-fist punches, Mr. Arrington would be at a disadvantage if he were attacked by Aggressor No.1, who was substantially younger than the forty-nine (49) year old Mr. Arrington.

32.     As a result, Mr. Arrington removed the revolver from his leg-holster and put the revolver in his pocket.  Afterwards, Mr. Arrington walked over, near where a crowd had grown to watch Aggressor No. 1's violent assault upon the Young Lady.  However, at no time did Mr. Arrington initiate engagement with Aggressor No. 1 or anyone else.

33.     Upon getting closer, Mr. Arrington did not actively pursue Aggressor No. 1.  Mr. Arrington simply headed closer to Aggressor No. 1's violent assault on the Young Lady, where Mr. Arrington would stand in close proximity of the crowd that had then gathered to witness, in awe, Aggressor No. 1's violent broad-daylight assault on the Young Lady.

34.     While violently beating the Young Lady, Aggressor No. 1 repeatedly told the Young Lady that he was going to shoot her.

35.     Mr. Arrington and the crowd stood there watching Aggressor No. 1's assault on the Young Lady, who resisted his friends' attempts to pull Aggressor No. 1 away from assaulting the Young Lady.

36.     Ultimately, Aggressor No. 1 eventually paused, as he realized that a crowed had grown to watch Aggressor No. 1's assault on the Young Lady.

37.     Upon stopping, Aggressor No. 1 looked around at the crowed and ultimately zeroed-in on Mr. Arrington, making eye-to-eye contact and then in saying loudly, while looking

directly at Mr. Arrington, "I don't know why the fuck people are watching me, y'all [sic] need to mind your fucking business."

38.     Mr. Arrington did not respond to Aggressor No. 1's statement.

39.     As Aggressor No. 1 made the aforementioned inflammatory statement, he got on a bicycle and rode by Mr. Arrington and directed an additional inflammatory statement at Mr. Arrington, asking him "[w]hat are you watching me for?  You need to mind your fucking business."  In response, Mr. Arrington stated "I'll watch what the hell I want to; and in a much more civil tone ""why are you beating on a female."  Aggressor No. 1 simply responded "[y]ou just need to mind your fucking business before you get fucked up and shot," while he continued riding pass Mr. Arrington.

40.     At that point, Mr. Arrington intended to return to his car, because Aggressor No. 1 was no longer violently assaulting the Young Lady and he was riding away from Mr. Arrington and the Young Lady."

41.     However, at that exact moment, Aggressor No. 1 yelled over to about three (3) or four (4) other young males, who appeared to be waiting on a nearby street corner for Aggressor No. 1, "Yo [sic] this little mother fucker over here needs to mind his fucking business."

42.     That statement by Aggressor No. 1, to the group of males drew their attention to Mr. Arrington.  At that point, Mr. Arrington knew that it wasn't safe for him to return to the vehicle wherein his fiancée and two daughters were waiting for him, as Mr. Arrington was concerned that Aggressor No. 1, who had been telling the Young Lady that he was going to shoot her, might be retrieving a weapon.

43.     For a brief moment, Mr. Arrington lost sight of the group of males, as several vehicles passed by.

9

44.     When Mr. Arrington regained visual of the group of males, the group of males had dispersed, but nonetheless, converging upon Mr. Arrington.

45.     Mr. Arrington's eldest daughter, Arjalae who could see this, attempted to scream out "watch out daddy," so as to warn Mr. Arrington that he was being surrounded by the group of young males.

46.     Mr. Arrington knew that he could not flee in the direction of the vehicle in which his family sat, waiting for his return, because that would draw the group's attention to his family, which would have endangered his family.

47.     As a result, Mr. Arrington stood where he was at.

48.     Several members of the group crossed the street and attempted to move in a stealth manor upon the side of Mr. Arrington.

49.     In converging upon Mr. Arrington, Aggressor No. 1 rode his bicycle up to Mr. Arrington.

50.     When Aggressor No. 1 got close enough, Mr. Arrington, got in what is called the "interview stance."

51.     As a Correction Officer, Mr. Arrington learned that in speaking with aggressive individuals, as a safety measure in dealing with aggressive individuals, one slants his or her body on a ninety (90) degree angle, while placing his or her forehand and fingers out in a pointed manner, as if to give instructions, while maintaining a distance away from the aggressive individual.

52.     The point of the "interview stance," is to slant one's internal organs away from the aggressive individual so that the internal organs are not so readily exposed that they are

10

placed in more danger. Additionally, the "interview stance," allows one to maintain a distance from the aggressive individual.

53.     Mr. Arrington reached out in the interview stance upon Aggressor No. 1's approaching Mr. Arrington telling Mr. Arrington that he would be shot, but another individual (hereinafter "Aggressor No. 2), quickly approached from Aggressor No. 1's side.

54.     In approaching, Aggressor No. 2, moved quickly and so closely to Aggressor No. 1's side that Aggressor No. 2 brushed against Aggressor No. 1's side, while stepping into the breach Mr. Arrington was maintaining with Aggressor No. 1, by means of the interview stance.

55.     Upon entering the breach between Aggressor No. 1 and Mr. Arrington, Aggressor No. 2 asked Mr. Arrington if he wanted to get shot while Aggressor No. 2 simultaneously began attempting to retrieve his firearm, which Mr. Arrington observed to be a 9 millimeter firearm that Aggressor No. 2 had been maintaining in the waistband of his pants.

56.     Mr. Arrington, who is familiar with firearms from his experience of firearms training as a Correction Officer, recognized Aggressor No. 2's firearm to be what Mr. Arrington believed to be a 9 millimeter firearm.

57.     However, in reaching for his firearm, Aggressor No. 2 was unable to immediately retrieve it as it fell down into his pants, where Aggressor No. 2 was maintaining it simply within his pants waistband. As a result, Aggressor No. 2 began fumbling to reach for his firearm.

58.     Aggressor No. 2's inability to immediately retrieve his firearm from his waistband for purposes of shooting Mr. Arrington, gave Mr. Arrington, who was standing in the interview instance, an otherwise awkward position from which to fire a firearm, an opportunity to fire a single shot from his firearm, which was being concealed in Mr. Arrington's coat-pocket.

11

59.     Mr. Arrington, acted as quickly as he could to steady himself to fire the shot, where Mr. Arrington jumped trying to bring his feet together, managing to fire a single shot through his coat-pocket.

60.     Upon being arrested, the authorities confiscated Mr. Arrington's coat, the pocket of which, as a result of the revolver, now possessed a bullet-hole in it.

61.     When Mr. Arrington fired that shot, the Aggressors, including Aggressors Nos. 1 and 2, immediately dispersed and could be heard running away saying "who shot, who shot, he shot, that little mutha fucka [shot]."

62.     It appeared to Mr. Arrington that his single shot grazed Aggressor No. 1, as he stood danger-close to Aggressor No. 2.  Aggressor No. 1, appeared to grimace a bit, before turning to disperse with the other aggressors.

63.     Upon firing that single shot, Mr. Arrington immediately scanned the area, realized that the Aggressors were in retreat and so he didn't fire another shot.

64.     Mr. Arrington immediately went back to the vehicle which his family was in and they drove about a block away where Mr. Arrington made a 911 call informing the authorities of the shooting.

65.     Mr. Arrington stayed at the location until the authorities arrived and went back to the scene of the incident with the police, where he informed them of what had occurred, namely that he fired his gun, because he saw Aggressor No. 2 trying to retrieve his firearm to shoot Mr. Arrington.

66.     Shortly thereafter, the police arrested Mr. Arrington and charged him with numerous felony offenses, including attempted murder and criminal possession of a weapon.

67.     Although Mr. Arrington had supplied the police with his concealed weapons carry permit, the police suppressed or otherwise destroyed such and initially tried charging Mr. Arrington with criminal possession of a weapon, before abandoning such.

68.     The police took Mr. Arrington's concealed weapons carry permit pursuant to its protocol to confiscate such during such an arrest.

69.     Ultimately, the criminal instrument filed with the criminal court charged Mr. Arrington with three felony offenses.

70.     Mr. Arrington was charged with violation of New York Penal Law Section 120.10(1) Assault in the First Degree, a Class B Violent Felony, with sentencing exposure of as much as twenty-five (25) years.

71.     Additionally, Mr. Arrington was charged with violation of New York Penal Law Section 120.05(1), Assault in the Second Degree, a Class D Violent Felony, with sentencing exposures of as much as seven (7) years.

72.     And Mr. Arrington was charged with violation of New York Penal Law Section 120.05(2), Assault in the Second Degree, a Class D Violent Felony, with sentencing exposure of as much as seven (7) years.

73.     The District Attorney's office declined to prosecute Garofalo's charges that Mr. Arrington unlawfully possessed the revolver and that he attempted to murder Aggressor No. 1.

74.     The Defendant's probable cause determination was premised solely upon (1) Mr. Arrington's statement to authorities that he fired his firearm in self-defense (hereinafter referred to as "self-defense statement") and (2) the fact that Aggressor No. 1 had sustained a gunshot injury.

75.     Not only was it the case that Mr. Arrington's self-defense statement formed the Defendant's sole account of the events in question, but also that Mr. Arrington's self-defense statement formed the Defendant's sole credible account of the events in question (e.g. the Defendant possessed corroboration of Mr. Arrington's self-defense statement such as Mr. Arrington's coat, showing that at the time he fired the revolver it was concealed in Mr. Arrington's coat-pocket).

76.     Garofalo conceded that he had not investigated whether Mr. Arrington had acted in self-defense.  That is to say, he possessed no competing claim that Mr. Arrington had not acted in self-defense.

77.     Rather, Garofalo engaged in a flawed probable cause determination for purposes of concluding that Mr. Arrington committed the alleged crimes.  That Garofalo is evinced by the fact that Garofalo initially charged Mr. Arrington with criminal possession of a weapon despite Garofalo being in possession of Mr. Arrington's then valid concealed weapon carry permit.  Similarly, Garofalo attempted to charge Mr. Arrington with attempted murder despite the fact that the only evidence Garofalo possessed, apart from Aggressor No. 1's injury, was Mr. Arrington's self-defense statement, providing the only credible account of the events in question.

78.     The Defendant City of New York's malicious conducted continued even after the underlying criminal action had been dismissed, where they mailed Mr. Arrington a letter stating that as of March 19, 2014, Mr. Arrington license to carry a firearm had been terminated and his firearm would not be returned.  That action was premised solely and squarely upon the underlying criminal action that had already been dismissed.

79.     On information and belief, such being the Order of Protection and the criminal complaint issued during criminal proceedings, Aggressor No. 1's name is Dale Jackman.

14

80.     Under New York law, Mr. Arrington was justified in using deadly force to meet Aggressor No. 2's attempted use of deadly force, because (1) Mr. Arrington reasonably believed such was necessary to defend himself from what Mr. Arrington believed to be the use of imminent unlawful deadly force, (2) where Mr. Arrington could not retreat to safety.

81.     Aggressor No. 2 was literally reaching for his firearm to shoot Mr. Arrington at the time Mr. Arrington fired his shot.  Mr. Arrington had no time to get away.

82.     That fact was noted in Mr. Arrington's written statement to authorities, in referring to Aggressor No. 2, stating in pertinent part, "he raised his shirt revealing a 9 mm semi-automatic weapon."

83.     Possessing only Mr. Arrington's self-defense statement and knowledge of Aggressor No. 1's injury, Garofalo's probable cause determination turned solely and squarely upon whether (1) Mr. Arrington reasonably believed imminent unlawful deadly force would be used against him and (2) whether Mr. Arrington could retreat to safety.

84.     That such probable cause determination was so premised is also evinced by the Defendant Garofalo's underlying criminal complaint that premises his criminal claims solely and squarely upon what Garofalo termed Mr. Arrington's "confession," (i.e. Mr. Arrington's self-defense statement) and knowledge of Aggressor No. 1's injury.

85.     However, review of the underlying criminal complaint, evinces that Garofalo distorted and manipulated Mr. Arrington's self-defense statement for purposes of trying to establish probable cause.

86.     Defendant Garofalo's criminal complaint alleges a confession of culpatory conduct, by tenuously suggesting that Mr. Arrington never actually told the police that he saw the firearm in the waistband of Aggressor No. 2.

15

87.     The distinction between a self-defense statement in which one claiming self-defense claims to have actually seen the alleged victim trying to retrieve a firearm, verses a self-defense statement in which one claiming self-defense claims only to have thought he or she saw the alleged victim trying to retrieve a firearm, is incredibly important.

88.     Defendant Garofalo, a seasoned officer, understood that distinction.

89.     In being arrested Mr. Arrington provided the police with a verbal and written statement of the incident, when informing the police that he discharged his firearm because he saw a firearm in Aggressor No. 2's waistband and that Aggressor No. 2 was reaching for that weapon so that he could shoot Mr. Arrington.

90.     The police arrested Mr. Arrington and placed him in jail, where Mr. Arrington remained for a couple of days.

91.     On or about March 7, 2014, the Queens County Grand Jury convened to consider indictment of Garofalo's underlying criminal claims against Mr. Arrington decided that Garofalo's underlying criminal claims should be dismissed; and on March 7, 2014 the Grand Jury dismissed Garofalo's criminal claims against Mr. Arrington.

92.     On March 10, 2014, the Queens County Criminal Court for the City of New York, entered judgment of dismissal of the underlying criminal case against Mr. Arrington under Queens County Criminal Court Docket Number 2013QN058440.

**3.    Officer Garofalo, Operating Pursuant To Municipal Policy And The NYPD's Acting Pursuant To Municipal Gun Licensing Policy**

93.     Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "92" above.

94.     Garofalo's arrest of Mr. Arrington occurred pursuant to the New York City Police Department's ("NYPD") Patrol Guide policy, as well as the NYPD's other customary arrest practices, policies, protocol, and procedures.

95.     At the time in question, the NYPD, as well as the City of New York (i.e. New York City Council and Mayor's Office), were aware of claims that police officers' training and supervision under the aforementioned municipal policing policies, practices, protocol, procedures, and customs were inadequate, such that such policing practices, policies, protocol, procedures and customs as well as the inadequate training and supervision with regard thereto, systemically resulted in the violation of the constitutional rights of citizens and residents, including Hispanics, such that Garofalo's seizure and arrest of Mr. Arrington pursuant to said aforementioned policing practices, policies, protocol, procedures and customs was the result of the City of New York's deliberate indifference to said rights.

96.     Despite having been found guilty in August 2013 regarding and having been made aware of claims that police officers' training and supervision as to the NYPD's policing practices, policies, protocol procedures, and customs, was inadequate such that such policing practices, policies, protocol, procedures and customs, systemically resulted in the violation of the constitutional rights of citizens and residents, the City of New York (i.e. New York City Council and the Mayor's Office), did not remedy the aforementioned inadequacies until January 2014.

97.     Those aforementioned policing policies, practices, protocol procedures, and customs were the subject of a bench trial of national prominence, before the Honorable Shira A. Scheindlin of the United States District Court for the Southern District of New York.

98.     After an exhaustive review of the evidence, Judge Scheindlin found that the NYPD's policing practices, policies, protocol, procedures, and customs had the force of law, such that they constituted municipal policy.

99.     In pertinent part, Judge Scheindlin found that the NYPD's policing practices, policies, protocol, procedures, and customs as to officers' probable cause determinations that were based heavily in New York common law, did not meet the reasonable belief standard required under the Fourth and Fourteenth Amendments of the United States Constitution, because *inter alia*, the NYPD's probable cause determination was permitted on inarticulable suspicion and there was inadequate supervision of officers' arrests where the focus of officers' arrest was on productivity and there was absolutely no focus on the factual substance of officers' arrests.

100.    Ultimately, the City of New York conceded Judge Scheindlin's findings of facts and conclusions of laws, and withdrew its appeal thereof.

101.    Review of the NYPD's Patrol Guide policy, reveals that a great importance is placed upon the State of New York's common and statutory laws, as to stops and arrests, generally, and the detection and arrest of firearm offenders.

102.    The NYPD's Patrol Guide policy calls for heavy supervision and verification of an officers' arrests.

103.    Garofalo knew that suppression of Mr. Arrington's stating that he actually saw the firearm that Aggressor No. 2 was reaching for in his waistband, for purposes of shooting Mr. Arrington would go further in establishing Garofalo's claimed probable cause.  As such, Garofalo's criminal complaint was laden with suggestions that Mr. Arrington thought Aggressor No. 2 was trying to retrieve a firearm.

104.     Garofalo understood that Mr. Arrington's actually stating that he actually saw the firearm Aggressor No. 2 was seeking to retrieve, obliterated Garofalo's claimed probable cause.

105.     As a result, Garofalo suppressed that Mr. Arrington stated that he in fact saw Aggressor No. 2's reaching for his illegal firearm to shoot Mr. Arrington.

106.     Additionally, Garofalo suppressed evidence that Aggressor No. 1 and Aggressor No. 2, were acting aggressively.

107.     Garofalo knew that suppression of such evidence could be used in Garofalo's fabricated story.

108.     As noted, pursuant to the Patrol Guide policy, Garofalo's arrest of Mr. Arrington was to be verified.

109.     Nonetheless, during verification of Garofalo's arrest of Mr. Arrington, the fact Mr. Arrington saw Aggressor No. 2's firearm and his attempt to retrieve such to shoot Mr. Arrington, as well as Aggressors violent conduct were ignored, despite the requirement of verification.

110.     Those facts were ignored, because the NYPD's policing practices, policies, protocol, procedures, and customs focused on productivity rather than the factual substance of Garofalo's arrest of Mr. Arrington.

111.     Garofalo knew that the NYPD's policing practices, policies, protocol, procedures, and customs was not to review the factual substance of officers' arrests, and therefore he could effectuate Mr. Arrington's arrest on the incredible claims.

112.     The City of New York's policymakers (i.e. New York City Council and the Mayor's Office), were well aware that supervision of police officers, in accordance with the NYPD's established policing practices, policies, protocol, procedures, and customs, was

systemically inadequate such that the result of officers' persistent and widespread failure to act

pursuant thereto, resulted in a deliberate indifference as to constitutional rights, having the force

of law.  Nonetheless, the City took no meaningful efforts to protect citizens against such

deprivations until January 2014.

113.    The NYPD, acting pursuant to official municipal policy, as to gun licensing,

claims to act pursuant to a policy that allows it to act on behalf of the City of New York to

confiscate and destroy firearms and terminate gun licensing privileges where one has been

charged with a crime, even where said charges are later thrown out.

## C. <u>CAUSES OF ACTION AND RELEVANT FACTUAL ALLEGATIONS</u>

### <u>FIRST CAUSE OF ACTION</u>

**The Defendant Garofalo Maliciously Prosecuted Mr. Arrington where Garofalo Commenced, Instigated and Continued Criminal Proceedings against Mr. Arrington in Absence of Probable Cause, with Actual Malice**

114.    Plaintiff repeats and re-states as if stated herein all averments set forth in

Paragraphs "1" through "113" above.

115.    Garofalo was affirmatively active in instigating and/or participating in Mr.

Arrington's criminal prosecution where Garofalo was the claimant, such that Garofalo was the

moving cause of Mr. Arrington's prosecution.

116.    Garofalo did more than merely report an alleged crime or merely possessed

knowledge or merely acquiesced in or consented to the acts of the Queens County District

Attorney's Office, as Garofalo came forward and presented fraudulent, false, and perjurious

information to the prosecutor and suppressed evidence in regards to such presentment, doing so

in the absence of a request for such information, reasonably knowing that such would be relied

on by the Queens County District Attorney's Office for purposes of prosecution.

117.     Garofalo lied, claiming that Mr. Arrington unjustifiably shot Aggressor No. 2, where Garofalo's lie was premised upon the suppression of evidence that Mr. Arrington acted in self-defense, having seen Aggressor No. 2 attempting to retrieve his firearm to shoot Mr. Arrington and where Aggressor No. 2 was the initial aggressor.

118.     Garofalo's criminal complaint that is premised solely upon Mr. Arrington's self-defense statement and notation of the alleged fact that Aggressor No. 1 sustained a serious injury, omits Mr. Arrington's self-defense statement that he actually saw Aggressor No. 2's firearm, he was trying to retrieve for purposes of shooting Mr. Arrington.

119.     Nonetheless, Garofalo presented that part of Mr. Arrington's very detailed self-defense statement, describing Aggressor No. 2's behavior that would suggest to one not privy to Mr. Arrington's self-statement that, he never actually so Aggressor No. 2 with a firearm, wherein Garofalo's criminal complaint states in pertinent part, "…ANOTHER ONE FROM THE GROUP RAN UP TO ME RAISING HIS SHIRT *AS IF* O [sic] RETRIEVE A WEAPON…"

120.     Garofalo understood that the distinction between a statement that Mr. Arrington actually saw the gun Aggressor No. 2 was reaching for to shoot Mr. Arrington, verses a statement that Mr. Arrington stated only that Aggressor No. 2 acted as though he was retrieving a weapon, bears heavily upon whether Mr. Arrington reasonably perceived that Aggressor No. 2's use of deadly force was imminent and whether Mr. Arrington could have retreated.

121.     Garofalo's omission of the most material fact in the case (i.e. that Mr. Arrington actually saw Aggressor No. 2's firearm), constitutes the intentional suppression of exculpatory evidence for a purposes other than to see the ends of justice carried out.

122.     Additionally, there was no probable cause for Garofalo's bringing of charges against Mr. Arrington where Mr. Arrington informed Garofalo that Mr. Arrington shot his

21

firearm because (1) Aggressor No. 2 was going to shoot Mr. Arrington, (2) Mr. Arrington saw Aggressor No. 2's firearm, and (3) Aggressor No. 2 was attempting to retrieve such firearm to shoot Mr. Arrington.

123.    Apart from having been informed that Aggressor No. 1 had sustained an injury, Garofalo sole account of the events in question was Mr. Arrington's credible self-defense statement.  Thus, not only was it the case that Garofalo did not possess any credible evidence that Mr. Arrington had not acted in self-defense, but also that Garofalo possessed no evidence that Mr. Arrington had not acted in self-defense.  Therefore, probable cause was wholly lacking/

124.    The Queens County Grand Jury impanelled to determine whether there was basis for the underlying criminal charges, heard such evidence and dismissed Garofalo's underlying criminal claims against Mr. Arrington.

125.    Garofalo's decision to maliciously prosecute Mr. Arrington was premised upon the NYPD's ill-advised prior probable cause policy permitting less probable cause than that required by the United States Constitution.  That official probable cause policy was found to be unlawful as noted herein.  And the City of New York, in January 2014, accepted that its probable cause determination was previously unlawful prior to January 2014.

126.    Additionally, Garofalo's decision to prosecute Mr. Arrington was because Mr. Arrington had dared to exercise his United States Constitution Second Amendment right to bear arms.

127.    Garofalo's hostility toward Mr. Arrington's Second Amendment rights was premised upon the then City of New York's hostility toward such rights, which then Mayor Bloomberg, is famously on the record as opposing.  As such, the Defendants terminated Mr.

Arrington's firearm privileges for the alleged arrest, *after* the underlying criminal charges had been dismissed.

128.    Although, the NYPD's Protocol Guide policy required the police to confiscate Mr. Arrington's carry-permit and his firearm, to this date neither property has been delivered back to Mr. Arrington, despite the fact that the matter was dismissed some time ago.

129.    As to Garofalo's confiscation of Mr. Arrington's carry-permit, Garofalo attempted to destroy such for purposes of trying to justify his arrest and charging of Mr. Arrington, while lobbying the Queens County District Attorney's Office for more severe charges (e.g. attempted murder) of Mr. Arrington.

130.    Garofalo's destruction and suppression of Mr. Arrington's carry-permit was his profligate attempt to conceal that Mr. Arrington lawfully possessed his firearm.

131.    On its face, the underlying criminal complaint, which consists entirely of Mr. Arrington's self-defense statement, never supported the underlying crimes charged, as well as Garofalo's claim that Mr. Arrington confessed to having committed the underlying criminal charges.

132.    Garofalo's underlying criminal complaint was a feeble attempt to justify his arresting and charging of Mr. Arrington on the very serious criminal charges.

133.    The underlying criminal complaint, attempted to suppress the conclusive nature of Mr. Arrington's self-defense statement that he acted because he actually saw Aggressor No. 2's firearm in his waistband.

134.    Garofalo's suppression of the fact that Mr. Arrington informed the police that he had actually seen Aggressor No. 2's firearm, was a feeble attempt to undermine Mr. Arrington's self-defense and bolster Garofalo's claimed probable cause.

## SECOND CAUSE OF ACTION

**Defendant Garofalo Falsely Arrested the Plaintiff Stephen Arrington**

### I.      The Defendant intended to confine Mr. Arrington

135.     Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "134" above.

136.     On October 20, 2013, Garofalo arrested Mr. Arrington for purposes of taking him into custody for prosecution and resulting confinement.

137.     Garofalo knowingly prepared the false criminal complaint that resulted in Mr. Arrington's arrest.

### II.      Mr. Arrington was aware of the resulting confinement

138.     Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "137" above.

139.     Mr. Arrington was confined to the custody of the New York City Department of Correction where he was housed in the Queens Detention Center for a couple of days before being released on his own recognizance pending the resolution of his criminal case.

### III.      Mr. Arrington did not consent to confinement

140.     Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "139" above.

141.     Mr. Arrington challenged the criminal charges against him as well as the resulting confinement.

142.     As a result of such challenges, Mr. Arrington was released on his own recognizance and the Grand Jury dismissed the underlying criminal claims against Mr. Arrington.

24

## IV.    Mr. Arrington's confinement was not privileged

143.    Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "142" above.

144.    As noted herein, there was no probable cause for Mr. Arrington's arrest, as Garofalo undertook such custody, by suppressing evidence and misrepresented Mr. Arrington's self-defense statement and otherwise acted in bad faith for purposes of seeking Mr. Arrington's prosecution and conviction for purposes of punishing Mr. Arrington for exercising his Second Amendment right to bear-arms in his defense and subjecting Mr. Arrington to less probable cause than that required by the United States constitution for the alleged commission of a crime.

### THIRD CAUSE OF ACTION

### Defendant Garofalo's Malicious Abuse of Criminal Process

145.    Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "144" above.

146.    Process regularly issued in Mr. Arrington's criminal prosecution.

147.    Garofalo intended to do harm to Mr. Arrington without excuse or justification in having Mr. Arrington prosecuted on Garofalo's suppression and misrepresentation of the evidence and acts of bad faith (e.g. suppression Mr. Arrington's telling police that he actually saw the firearm in Aggressor No. 2's waistband that he was reaching for), for the purpose of punishing Mr. Arrington for having exercised his Second Amendment right to bear-arms in his defense and subjecting Mr. Arrington to less probable cause than that required by the United States Constitution.

148.    Garofalo commenced, instigated and continued the proceeding against Mr. Arrington.

149.    The proceedings ended in Mr. Arrington's favor with the Grand Jury dismissing the underlying criminal claims and charges on March 7, 2014 and the Queens County Criminal Court entering judgment thereof on March 10, 2014.

150.    Garofalo's conduct implicates Mr. Arrington's constitutional rights not to be deprived of his liberty, where Garofalo's use of the criminal process for a purpose other than as provided for by law (i.e. to punish Mr. Arrington for exercising his Second Amendment right to bear-arms and to subject Mr. Arrington to less probable cause than required under the United States Constitution), violates due process.

151.    As noted herein, Garofalo has acted with actual malice.

## FOURTH CAUSE OF ACTION

**Defendant Garofalo's Suppressing Exculpatory Evidence regarding Mr. Arrington's Alleged Criminality, as Discussed Herein, Violated Mr. Arrington's Fifth and Fourteenth Amendments U.S. Constitutional Rights not to be Deprived of His Liberty as a Result of said Fabrication of Evidence by the Defendant**

152.    Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "151" above.

153.    Garofalo never conducted an objective investigation of the claimed charges against Mr. Arrington.

154.    Additionally, Garofalo purposefully suppressed Mr. Arrington's telling police that he actually saw the firearm in the waistband of Aggressor No. 2 that he was trying to retrieve for purposes of shooting Mr. Arrington.

155.    Garofalo's intentional suppression of evidence of an objective investigation was for the purpose of punishing Mr. Arrington for having exercised his Second Amendment right to bear-arms in his defense and subjecting Mr. Arrington to less probable cause than required by the United States Constitution.

## FIFTH CAUSE OF ACTION

**Defendant Garofalo's Conduct of Fabricating Claims of Mr. Arrington's Alleged Criminality as Discussed Herein Constitutes Negligent Infliction of Emotional Distress, Reckless Infliction of Emotional Distress or Intentional Infliction of Emotional Distress Encompassed in Mr. Arrington's Civil Rights Claims**

156.    Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "155" above.

157.    Garofalo owed Mr. Arrington a duty that Garofalo would not use the capacity of his public office for personal gain in violation of Mr. Arrington's constitutional rights not to be unreasonably deprived of his liberty and to be free from unreasonable searches and seizure.

158.    Garofalo's conduct of suppressing exculpatory evidence for the purpose of punishing Mr. Arrington for exercising his Second Amendment right to bear-arms in his defense and to subject Mr. Arrington to less probable cause than required under the United States Constitution, negligently caused psychological trauma to Mr. Arrington, and violated Garofalo's duties.

159.    Garofalo's conduct was so extreme in degree, as to go beyond all possible bounds of decency, such that it is atrocious, and utterly intolerable in a civilized community that a police officer would suppress exculpatory evidence regarding alleged crimes against a citizen.

160.    More than just suppressing exculpatory evidence against Mr. Arrington, Garofalo knowingly used his public office to facilitate an unlawful prosecution of Mr. Arrington.

161.    Garofalo's conduct was done with the intent to cause, or disregarded the substantial probability that such conduct would cause Mr. Arrington severe emotional distress.

162.    Mr. Arrington's severe emotional distress was caused by Garofalo's extreme and outrageous conduct of knowingly fabricating and facilitating Mr. Arrington's unlawful

prosecution, where Garofalo's conduct among other things resulted in Mr. Arrington's

confinement within the Department of Correction.

## SIXTH CAUSE OF ACTION

**The NYPD's Policing Practices, Policies, Procedures, Protocol and Customs Pursuant to which the Defendant Garofalo was Operating, in Arresting and Charging Mr. Arrington, Renders the City of New York Liable for the Defendant Garofalo's Malicious Prosecution of Mr. Arrington**

163.    Plaintiff repeats and re-states as if stated herein all averments set forth in

Paragraphs "1" through "162" above.

164.    The NYPD's policing policies, practices, protocol, procedures and customs as to

NYPD police officers' probable cause determinations, arrests, and charging of suspects,

including Mr. Arrington, are so persistent and widespread that they have the force of law.

165.    The City of New York has conceded that the NYPD's policing policies, practices,

protocol, procedures and customs as to NYPD police officers' probable cause determinations,

arrests, and charging of suspects are so persistent and widespread that they have the force of law.

166.    Garofalo's irreparably flawed probable cause determination, arresting and

charging of Mr. Arrington was pursuant to the NYPD's policing policies, practices, protocol,

procedures and customs such that Garofalo was operating pursuant to official municipal policy.

167.    The City of New York had been informed and were aware that prior to January

2014, the NYPD's policing policies, practices, protocol, procedures and customs were such that

they were resulting in the systemic deprivation of liberties of citizens and residents.

168.    Despite being made aware of those systemic liberty deprivations, the City of New

York did not act until January 2014 to remedy those constitutional violations, thereby remaining

deliberately indifferent thereto until such time.

169.    The NYPD's policing policies, practices, protocol, procedures and customs, allowing Garofalo to arrest Mr. Arrington on less than the reasonable belief that Mr. Arrington engaged in the underlying criminal activity, as required under the Fourth and Fourteenth Amendments of the United States Constitution, was foreseeably violative of Mr. Arrington's Fourth Amendment and Fourteenth Amendment rights not to be unreasonably searched or seized.

170.    The NYPD's policing policies, practices, protocol, procedures and customs, allowed for Garofalo to arrest Mr. Arrington despite the absence of probable cause for purposes of Garofalo's irreparably flawed reasonable cause determination that Mr. Arrington had allegedly committed the underlying crimes, where there was inadequate supervision of Garofalo's arrest of Mr. Arrington where the mandated verification procedure failed to verify Garofalo's failure to (a) not misrepresent the evidence, and (b) to disclose exculpatory evidence, where such verification process focused only on productivity (e.g. that an arrest was made).

## SEVENTH CAUSE OF ACTION

**The NYPD's Policing Practices, Policies, Procedures, Protocol and Customs Pursuant to which the Defendant Garofalo was Operating, in Arresting and Charging Mr. Arrington, Renders the City of New York Liable for the Defendant Garofalo's Malicious Abuse of Criminal Process of Mr. Arrington**

171.    Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "170" above.

172.    The NYPD's policing policies, practices, protocol, procedures and customs as to NYPD police officers' probable cause determinations, arrests, and charging of suspects, including Mr. Arrington, are so persistent and widespread that they have the force of law.

173.    The City of New York has conceded that the NYPD's policing policies, practices, protocol, procedures and customs as to NYPD police officers' probable cause determinations, arrests, and charging of suspects are so persistent and widespread that they have the force of law.

174.    Garofalo's irreparably flawed probable cause determination, arresting and charging of Mr. Arrington was pursuant to the NYPD's policing policies, practices, protocol, procedures and customs such that Garofalo was operating pursuant to official municipal policy.

175.    The City of New York had been informed and were aware that prior to January 2014, the NYPD's policing policies, practices, protocol, procedures and customs were such that they were resulting in the systemic deprivation of liberties of citizens and residents.

176.    Despite being made aware of those systemic liberty deprivations, the City of New York did not act until January 2014 to remedy those constitutional violations, thereby remaining deliberately indifferent thereto until such time.

177.    The NYPD's policing policies, practices, protocol, procedures and customs, allowing Garofalo to arrest Mr. Arrington on less than the reasonable belief that Mr. Arrington engaged in the underlying criminal activity, as required under the Fourth and Fourteenth Amendments of the United States Constitution, was foreseeably violative of Mr. Arrington's Fourth Amendment and Fourteenth Amendment rights not to be unreasonably searched or seized.

178.    The NYPD's policing policies, practices, protocol, procedures and customs, allowed for Garofalo to arrest Mr. Arrington despite the absence of probable cause for purposes of Garofalo's irreparably flawed reasonable cause determination that Mr. Arrington had allegedly committed the underlying crimes, where there was inadequate supervision of Garofalo's arrest of Mr. Arrington where the mandated verification procedure failed to verify

30

Garofalo's failure to (a) not misrepresent the evidence, and (b) to disclose exculpatory evidence, where such verification process focused only on productivity (e.g. that an arrest was made).

## EIGHTH CAUSE OF ACTION

**The City of New York's Decision To Permanent Deprive Mr. Arrington Of His Weapon And Terminate Mr. Arrington's Concealed Weapon Carry Permit Based On The Underlying Criminal Charges, Where Such Had Been Dismissed, Violated Mr. Arrington's Second Amendment Right To Keep And Bear Arms In His Defense**

179.    Plaintiff repeats and re-states as if stated herein all averments set forth in Paragraphs "1" through "178" above.

180.    On March 19, 2014, the Defendant City of New York decided that it would not return Mr. Arrington's firearm, and that it would terminate Mr. Arrington's right to carry any firearm.

181.    That decision was based squarely upon the underlying criminal charges that had been dismissed, officially, on March 10, 2014.  Moreover, that decision relied upon Garofalo's criminal allegations of attempted murder and unlawful possession of a weapon, which the State of the New York, out right refused to prosecute Mr. Arrington for (i.e. declination not to prosecute or "DNP").

182.    The City's baseless action, of depriving Mr. Arrington of his firearm and terminating his right to carry any firearm, violates Mr. Arrington's Second Amendment right to bear-arms in his self-defense.

31

## JURISDICTION AND VENUE

183.    The claims asserted herein arise under federal law, namely 28 U.S.C.A. § 1332.

184.    The acts and practices complained of herein have occurred in this Judicial

District.

WHEREFORE, the Plaintiff prays for relief and judgment, as follows:

(a)    Awarding compensatory damages in favor of the Plaintiff against the Defendant

for all damages sustained as a result of the Defendant's wrongdoing, in an amount to be proven

at trial, including interest thereon;

(b)    Awarding punitive damages in favor of the Plaintiff against the Defendant for all

damages sustained as a result of the Defendant's wrongdoing, in an amount to be proven at trial;

(c)    Awarding the Plaintiff his reasonable costs and expenses incurred in this action,

including attorney's fees and expert fees;

(d)    Awarding the Plaintiff injunctive relief and/or declaratory relief; and

(e)    Granting such other further relief as the Court may deem just and proper

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
       September 25, 2014


                                        CARTER & ASSOCIATE ATTORNEYS, PLLC
                                        ATTORNEYS FOR THE PLAINTIFF

                          BY: _____ /s/Damond J. Carter
                                        Damond J. Carter
                                        224 West 35th Street, Suite 512
                                        New York, New York 10001
                                        (646) 405-5225, Ext. 5201 Telephone
                                        (888) 711-4420 Facsimile

32